**LAKELAND BUS LINES, INC., Petitioner,**

**v.**

**INTERSTATE COMMERCE COMMIS-SION and United States of America, Respondents,**

**American Bus Association, Intervenor.**

**No. 86–1215.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 18, 1986.

Decided Jan. 30, 1987.

Robert G. Rose, with whom Stephen Gimigliano, was on the brief, for petitioner.

Louis Mackall, Atty., I.C.C., with whom Robert S. Burk, Gen. Counsel and John J. McCarthy, Jr., Deputy Associate Gen. Counsel, I.C.C., Robert B. Nicholson, Atty. and Andrea Limmer, Atty., Dept. of Justice, were on the brief, for respondents.

Charles A. Webb, was on the brief, for intervenor.

Before WALD, Chief Judge, MIKVA, Circuit Judge, and GESELL,* District Judge.

Opinion for the Court filed by Chief Judge WALD.

WALD, Chief Judge:

Petitioner challenges the Interstate Commerce Commission's (ICC or Commission) denial of its requests for discovery and an

* Of the United States District Court for the District of Columbia, sitting by designation pursu- ant to 28 U.S.C. § 292(a).

oral hearing in connection with its protest of a motor carrier certificate application. Petitioner contends that the Commission's blanket denial of its discovery requests renders impossible its already difficult task of showing that the application is inconsistent with the public interest. Additionally, petitioner maintains that without the information sought in discovery, the ICC's decision to grant the license cannot be considered a reasoned one. Finally, petitioner argues that an oral hearing on the application was required. Because the Commission relied upon an incorrect factual premise in rejecting that portion of petitioner's discovery request that sought information regarding schedules, routes, and service points, we reverse the Commission with regard to this portion. We affirm the ICC's denial of the remainder of the discovery request and of an oral hearing.

## I. BACKGROUND

### A. *The Bus Regulatory Reform Act*

Congress enacted the Bus Regulatory Reform Act (BRRA), Pub.L. No. 97–261, 96 Stat. 1102 (1983) (codified at 49 U.S.C. § 10101 *et seq.*), "to reduce unnecessary and burdensome Government regulation" of motor carriers. S.Rep. No. 411, 97th Cong., 2d Sess. 13, *reprinted in* 1982 U.S. Code Cong. & Ad.News 2308, 2320. The

Act significantly reduces an applicant's burden of proof when seeking authorization to provide regular-route bus service. Under prior legislation, the applicant was required to demonstrate that it was in the public convenience and necessity for the application to be granted. 49 U.S.C. § 307 (repealed Pub.L. No. 95–473 § 4(b), 92 Stat. 1466 (Oct. 17, 1978), Pub.L. No. 97–449 § 7(b), 96 Stat. 2443 (Jan. 12, 1983)). Under the BRRA, however, the ICC must grant a regular-route application if it finds that the applicant is "fit, willing, and able" to provide the service sought to be authorized and to comply with statutory and regulatory requirements, unless the ICC finds, on the basis of evidence presented by any protesting party, that the transportation to be authorized "is not consistent with the public interest." 49 U.S.C. § 10922(c)(1)(A).

The "fit, willing, and able" standard simply means that the applicant must demonstrate safety fitness and compliance with certain insurance requirements. 49 U.S.C. § 10922(c)(6).[1] If a protestant seeks to demonstrate that the application is not within the public interest, the ICC must consider, to the extent applicable, the following four public interest factors: (a) the transportation policy of the United States as set forth in 49 U.S.C. § 10101(a),[2] (b) the

1. The ICC's regulations specify the information that must be included in applications to operate as a motor common carrier. 49 C.F.R. § 1160.-70–.88 (1986). The regulations require, among other things, that the application include a general description of the applicant, evidence that the applicant can operate safely, general proposed route descriptions, and "[a] brief description of the service that will be provided if the application is granted." 49 C.F.R. § 1160.75(e). There is no requirement that the application contain any detailed operating information.

2. The transportation policy is stated as follows:

[I]t is the policy of the United States Government to provide for the impartial regulation of the modes of transportation subject to this subtitle, and—

(1) in regulating those modes—

(A) to recognize and preserve the inherent advantage of each mode of transportation;

(B) to promote safe, adequate, economical, and efficient transportation;

(C) to encourage sound economic conditions in transportation, including sound economic conditions among carriers;

(D) to encourage the establishment and maintenance of reasonable rates for transportation, without unreasonable discrimination or unfair or destructive competitive practices;

(E) to cooperate with each State and the officials of each State on transportation matters; and

(F) to encourage fair wages and working conditions in the transportation industry;

(2) in regulating transportation by motor carrier, to promote competitive and efficient transportation services in order to (A) meet the needs of shippers, receivers, passengers, and consumers; (B) allow a variety of quality and price options to meet changing market demands and the diverse requirements of the shipping and traveling public; (C) allow the most productive use of equipment and energy resources; (D) enable efficient and well-managed carriers to earn adequate profits, attract capital, and maintain fair wages and working conditions; (E)

value of competition to the public, (c) the effect of issuance of the certificate on motor carrier service to small communities, and (d) whether issuance of the certificate would impair the ability of any common carrier to provide a substantial portion of the regular-route passenger service that the carrier already provides over its entire route system, except that diversion of revenue or traffic cannot by itself constitute such impairment. 49 U.S.C. § 10922(c)(3).[3]

The implementing regulations provide a procedure for obtaining discovery. 49 C.F.R. § 1114.21–.31 (1986). No discovery is permitted as of right. Instead, the ICC may authorize discovery pursuant to its own motion or on the verified petition of a party. 49 C.F.R. § 1114.21(b)(2).

### B. *The Proceedings in this Case*

Delaware Valley Transportation Company, operating under the name Pocono Mountain Trails (Pocono Mountain), applied to the ICC for permission to provide regular-route bus transportation over routes in New York, New Jersey, and Pennsylvania. Joint Appendix (J.A.) at 5a–12a. Pursuant to the BRRA's lenient application policy, the application contained only a general description of the applicant, its ability to meet safety and insurance requirements, and an itinerary of the major arteries that would constitute its regular routes.

Lakeland Bus Lines, Inc. (Lakeland), which provides commuter bus service be-

tween New York and New Jersey, protested Pocono Mountain's application, J.A. at 27a–124a, and sought discovery with regard to the following Pocono Mountain items: traffic surveys and studies, equipment, labor union contracts, existing operations schedules, existing operating authorities, and records regarding safety programs and safety violations. J.A. at 141a. Lakeland also requested an oral hearing. J.A. at 39a–42a.

The ICC denied Lakeland's discovery request *in toto*, denied its request for an oral hearing, and granted Pocono Mountain's application. *Delaware Valley Transportation Co. Extension—New York, New Jersey, and Pennsylvania Regular Routes*, ICC Decision, No. MC–28457 (Sub-No. 9) (Sept. 25, 1984), J.A. at 175a–184a. With regard to the discovery request, the Commission first noted that Pocono Mountain had provided all it was required to, albeit the bare minimum. J.A. at 175a–176a. Lakeland was seeking information that might help it meet its steep burden of proof, said the Commission, and in so doing had adopted a "shotgun approach." J.A. at 176a. The surveys and studies might not exist, the labor union contracts were of questionable relevance, and the safety information went beyond what the applicant is required to produce, added the ICC. J.A. at 176a. "An opposing carrier is not entitled to any special assistance," and where the discovery request "largely takes the

provide and maintain service to small communities and small shippers and intrastate bus service; (F) provide and maintain commuter bus operations; (G) improve and maintain a sound, safe, and competitive privately owned motor carrier system; (H) promote greater participation by minorities in the motor carrier system; and (I) promote intermodal transportation; and

(3) in regulating transportation by motor carrier of passengers (A) to cooperate with the States on transportation matters for the purpose of encouraging the States to exercise intrastate regulatory jurisdiction in accordance with the objections [sic] of this subtitle; (B) to provide Federal procedures which ensure that intrastate regulation is exercised in accordance with this subtitle; and (C) to ensure that Federal reform initiatives enacted by the Bus Regulatory Re-

form Act of 1982 are not nullified by State regulatory actions.

**3.** The regulations establish procedures for opposing requests for authority. 49 C.F.R. § 1160.90–.99. They provide that in considering a protestant's claim that a grant of authority would not be in the public interest, the four public interest factors be given equal weight. 49 C.F.R. § 1160.95(a). The regulations further grant the applicant the right to reply to any protests. 49 C.F.R. § 1160.83. Applicants may include new evidence in their replies when responding to protests filed on public interest grounds. 49 C.F.R. § 1160.83(b). Protestants may file rebuttals to an applicant's reply statement, if any is filed. 49 C.F.R. § 1160.95a. In contrast to an applicant's reply, a protestant's rebuttal cannot contain new evidence. 49 C.F.R. § 1160.95a(b).

form of a so-called fishing expedition," the Commission concluded that it would not grant such discovery. J.A. at 176a. Accordingly, it rejected Lakeland's discovery request in its entirety. J.A. at 176a. Finally, since there were no material facts in dispute, the ICC also rejected Lakeland's bid for an oral hearing. J.A. at 176a.

After the ICC rejected Lakeland's appeal and petition for a stay of Pocono Mountain's operating authority, J.A. at 185a–220a, Lakeland came to this court with the same requests. J.A. at 232a–237a. We denied the motion for a stay, J.A. at 238a, and denied reconsideration of this motion, J.A. at 241a, but before we could rule on the merits of the ICC's decision to grant a certificate to Pocono Mountain, the Commission voluntarily reopened the proceeding subject to our approval. J.A. at 249a. In so doing, the ICC revealed that "a potential error in the handling of [Lakeland's] discovery request" had been made. J.A. at 249a. Although Lakeland's request had been "overly broad," the ICC stated for the first time that "it now appears that some of the material sought ... may be relevant...." J.A. at 249a. The Commission added that

> [m]uch time has passed since the original discovery request [almost a year had passed]. Applicant has had authority to operate for several months, and it may have already begun operations. Thus much of protestant's discovery request may now be moot, and we will allow it to reformulate its request in light of applicant's operations, if any. Protestant will be given 15 days to file a renewed request, explaining why each item sought is relevant and material to the statutory criteria of 49 U.S.C. § 10922(c)(3).

J.A. at 249a. We granted the Commission's motion for remand. *Lakeland Bus Lines v. ICC,* No. 84–1607 (D.C.Cir. Sept. 5, 1985), J.A. at 253a.

Lakeland's second discovery request, J.A. at 259a–264a, included all the items in the first one, and added information regarding fares and costs, service points, joinder of routes, character and quality of type of service, and intention *vel non* to serve small communities already served by Lakeland. Lakeland also described the relevance of the information requested in terms of the statutory criteria. Thus, it needed information regarding schedules, fares, service points, joinder of routes, character and quality of type of service, and traffic surveys and studies, in order to determine whether Pocono Mountain's operations would substantially impair Lakeland's entire system. 49 U.S.C. § 10922(c)(3)(D). It desired information regarding schedules, service points, joinder of routes, and intention *vel non* to serve small communities already served by Lakeland, in order to determine Pocono Mountain's effect on overall service to small communities. 49 U.S.C. § 10922(c)(3)(C). It wanted the information regarding operations for an additional reason, so it could determine the effect on commuter bus operations. 49 U.S.C. § 10922(c)(3)(A) & § 10101(a)(2)(F). It asked for information regarding equipment, existing operations, and safety programs and record, in order to determine Pocono Mountain's safety and efficiency. 49 U.S.C. § 10922(c)(3)(A) & § 10101(a)(1)(B). It requested information regarding wages and working conditions in order to satisfy statutory interest in those areas. 49 U.S.C. § 10922(c)(3)(A) & § 10101(a)(1)(F). Finally, it sought information regarding fares and costs in order to show Pocono Mountain's effect on rates and economic conditions. 49 U.S.C. § 10922(c)(3)(A) & § 10101(a)(1)(C) & § 10101(a)(1)(D). Lakeland also renewed its request for an oral hearing.

The Commission again rejected Lakeland's discovery request *in toto,* and again denied its request for an oral hearing. *Delaware Valley Transportation Co. Extension—New York, New Jersey, and Pennsylvania Regular Routes,* ICC Decision, No. MC–28457 (Sub-No. 9) (Feb. 27, 1986), J.A. at 285a–288a. First, the ICC noted that Lakeland had broadened, rather than narrowed its discovery request, and reiterated that Lakeland appeared to be engaged in a "fishing expedition." J.A. at 286a. Then, turning to Lakeland's specific

discovery requests, the Commission began by rejecting its demand for information regarding schedules, routes, and service points. It commented that "[i]t is difficult to believe that protestant does not already have access to ample information in these areas." J.A. at 287a. Information about Pocono Mountain's operating authorities for its previously existing operations is readily available, said the ICC; "[m]oreover, from its experience in competing with applicant, both before and since the issuance of applicant's unrestricted authority, protestant should be aware that applicant is a very small carrier conducting a modest commuter operation." J.A. at 287a.

The ICC next denied Lakeland's search for surveys and studies on the ground that none existed, and for equipment information on the ground of irrelevance. With regard to Lakeland's assertion that it needed various information to address the goals of the national transportation policy, 49 U.S.C. § 10922(c)(3)(A) & § 10101(a), the ICC responded that "[t]here is no suggestion by Lakeland that it believes that it will find evidence leading to a conclusion that a grant would be inconsistent with any of the goals of the ... policy." J.A. at 287a.

Turning to Lakeland's requests for various information so that it could address the statutory issues of competition, effect on small communities, and impairment of protestant's entire system, the ICC first replied that "[t]hese issues were fully addressed in the division's decision, and protestant has not suggested that it antic-

ipates uncovering any facts that would warrant conclusions different from those of the division." J.A. at 287a. The Commission added that Lakeland's "experience in competing with applicant both before and after the issuance of an unrestricted certificate should have enabled it to identify with specificity any matters regarding which it believed discovery was required." J.A. at 287a. Finally, with regard to safety, the ICC reiterated its initial rejection by concluding that "applicant has provided all of the information required to establish its fitness." J.A. at 287a–288a. The ICC also again rejected Lakeland's request for an oral hearing. J.A. at 285a.

Lakeland petitioned this court for review of the ICC's order rejecting its requests for discovery and an oral hearing. J.A. at 289a–312a. We now affirm in the main but reverse as to one part.

## II. LAKELAND'S DISCOVERY REQUEST

■ The crux of Lakeland's petition for review is that by denying all discovery the Commission renders a protestant's task impossible, essentially relegating it to information it can gain independently.[4] While the Commission does not say so explicitly, its position seems to be that a protestant must indeed already have some information from an independent source suggesting a statutory basis for rejection so that it can focus discovery on proving a specific type of violation. The ICC is clearest on this point when it responds to Lakeland's requests pinned to the national transporta-

---

**4.** Petitioner also maintains that the ICC's decision to grant Pocono Mountain its requested authority cannot be considered a reasoned one because the Commission lacked "adequate public interest evidence in the record" because it failed to grant Lakeland any discovery. Petitioner cites *Cross-Sound Ferry Servs. v. ICC,* 738 F.2d 481 (D.C.Cir.1984), which holds that because the Commission lacked certain information its decision to grant a certificate of authority for Long Island Sound ferry service was arbitrary and capricious. Petitioner acknowledges that *Cross-Sound* involves water carrier operations, which are regulated under a different standard from motor carrier operations, 49 U.S.C. § 10922(a)(2), which on its face requires a finding that the proposed service "is or will be

required by the present or future public convenience or necessity." Petitioner tries to overcome this apparently dispositive distinction by referring us to footnote 1 of *Cross-Sound,* which describes a debate between the ICC and petitioner in that case on the issue of which entry test is applicable for water carriers. But the "more lenient standard" that *Cross-Sound* assumes, *arguendo,* is appropriate, is still more strict than the BRRA standard; it requires "the applicant [to] make the initial showing of public need for the service...." 738 F.2d at 485 n. 1. In sum, *Cross-Sound* is not on point. We also reject petitioner's variation on this argument, that the ICC's findings of fact in granting the certificate to Pocono Mountain are not supported by substantial evidence in the record.

tion policy by commenting that "[t]here is no suggestion by Lakeland that it believes that it will find evidence leading to a conclusion that a grant would be inconsistent with any of the goals of the national transportation policy." J.A. at 287a. In order for a protestant to state honestly that it believes that it will find evidence leading to a conclusion that would matter under relevant statutory criteria, common sense indicates that the protestant would have to come to such a belief through independent means. Lakeland objects to this bind, but can really find no legal hook on which to hang its objection.[5] The fact is that the BRRA *does* make a protestant's task quite difficult, and the permissive discovery regulation, 49 C.F.R. § 1114.21, provides no assistance to protestants in the form of rules dictating when the ICC *must* grant discovery. Thus, the Commission is well within its authority to reject a discovery request that merely restates the statutory criteria and asks for anything that might be relevant under those criteria, without narrowing the focus of the inquiry to aid both the Commission and the applicant who would be the subject of the discovery request.

Indeed, just recently this circuit upheld the ICC's rejection of a broad-based discovery request in a similar BRRA setting. *Trailways Lines v. ICC*, 766 F.2d 1537, 1546 (D.C.Cir.1985). Trailways had requested documents "regarding Greyhound's proposed schedules for and projected profits from the new routes, its policies and practices regarding terminals, interlining and related matters regarding its conduct with other carriers, and its current plans with respect to elimination and expansion of service." 766 F.2d at 1540 n. 5. The Administrative Law Judge (ALJ) ordered production of revenue projections on the proposed routes, information on the ownership of bus terminals, and information as to which carriers were allowed to use those terminals. 766 F.2d at 1540. Greyhound provided information regarding terminals, but stated that it had no revenue projections. 766 F.2d at 1540. It did represent that in preparing its applications it had relied primarily on its Senior Director of Operations, Ernest Simmons, and the ALJ offered Trailways the opportunity to depose Mr. Simmons. 766 F.2d at 1540. Trailways declined this offer, and the ALJ then denied the remainder of Trailways' discovery request. 766 F.2d at 1540.

This court affirmed, stating four reasons. First, "the conduct and extent of discovery in agency proceedings is a matter ordinarily entrusted to the expert agency in the first instance and will not, barring the most extraordinary circumstances, warrant the Draconian sanction of overturning a reasoned agency decision." 766 F.2d at 1546. Second, although Trailways had certain specific information in its possession already, its discovery request "wandered intrusively into Greyhound's systemwide operations." 766 F.2d at 1546. Third, the ICC correctly determined that much historical information sought was irrelevant. 766 F.2d at 1546. Finally, we reasoned that the ICC could "reasonably have determined that the broad-based information petitioners wanted would not, at the end of the day, have convinced the ICC to reject Greyhound's proposed schedules." 766 F.2d at 1546. *Trailways* cuts no corners, and sets forth a firm precedent of extreme deference to the ICC with regard to BRRA discovery matters.

■ Accordingly, we find most of the ICC's reasoning in denying Lakeland's discovery request *in toto* to be presuasive.

---

5. Petitioner refers us to a portion of the Senate Report on the BRRA, which states that "the burden placed on protestants is not insurmountable and ... the entry test should not be treated by the ICC as a regulatory charade." S.Rep. No. 411, 97th Cong., 2d Sess. 16, *reprinted in* 1982 U.S.Code Cong. & Ad.News 2308, 2323. Despite the ICC's blanket denial of discovery in this case, the ICC appears willing to entertain a protestant's attack on an application under the relevant statutory criteria. The fact that the Commission is quite reluctant to authorize discovery based on general statements of statutory relevance rather than more specific offers of proof does not convert the entry test into a regulatory charade; rather, it merely makes this particular entry test a rigorous one, in step with Congress' overriding intent.

Regarding Pocono Mountain's operations prior to this proceeding, the ICC correctly determined that Lakeland could gather the information independently. J.A. at 287a. The ICC also was well within bounds by denying access to traffic studies and surveys that Pocono Mountain claimed did not exist, as it was by denying access to equipment information that has "no bearing on the application." J.A. at 287a.

■ As we have discussed above, we approve the ICC's rejection of Lakeland's requests pinned to the national transportation policy, on the ground that Lakeland has merely requested the information it wants and stated the language of the policy without elucidating any semblance of more specific connection between the two. A protestant will always be able to state the statutory terms that are relevant to a protest and then request the type of information that those terms encompass; if we were to demand that the ICC grant discovery in such cases, we would not only be dictating procedure to the agency (which *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), tells us we must not do), but we would also be opening wide the gates for a flood of discovery requests. The vision of motor carrier certificate proceedings stretching on for eons is a pre-BRRA vision; Congress in passing the BRRA has clearly called for a simpler, smoother certification process.

■ Additionally, the ICC's rejection of the request for information regarding safety, J.A. at 287a–288a, on the ground that Pocono Mountain had already provided what it was statutorily required to provide on this matter, was a reasonable one.

With regard to Lakeland's attempt to address the issues of competition, effect on small communities, and systemwide impairment, the Commission said that it had already considered these factors in its decision to grant Pocono Mountain its requested authority. J.A. at 287a. However,

Lakeland's attempt to show effect on small communities and systemwide impairment centered on information regarding schedules, routes, and service points. The ICC, at various points throughout these proceedings—*including* its above-mentioned rejection of discovery regarding competition, small communities, and systemwide impairment—quite plainly relied on its presumption that Pocono Mountain had started running the new routes after the initial authorization, and therefore that between that authorization and the second discovery request Lakeland could gather scheduling, routing, and service point information from independent observation of Pocono Mountain's new operations. *See* J.A. at 249a (reopening proceeding in part because Pocono Mountain "may have already begun operations" and therefore "much of protestant's discovery request may now be moot"); J.A. at 287a ("It is difficult to believe that protestant does not already have access to ample information in these areas"; Lakeland should be aware of Pocono Mountain's size "from its experience in competing with applicant, both before *and since* the issuance of applicant's unrestricted authority"; Lakeland's "experience in competing with applicant both before *and after* the issuance of an unrestricted certificate should have enabled it to identify with specificity any matters regarding which it believed discovered was required") (emphases added).

■ It became clear at oral argument that Pocono Mountain has not yet begun to operate the newly authorized routes.[6] Therefore, the Commission's factual premise in the above arguments was incorrect. *SEC v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943), tells us that we can only judge an agency's actions on the grounds the agency invoked while taking the action. Accordingly, we must reverse the ICC's denial of discovery regarding schedules, routes, and service points,

---

6. Counsel for both Lakeland and the Commission stated during the course of oral argument that Pocono Mountain has not yet begun running the routes in question.

because the Commission relied on an inaccurate factual premise.[7]

### III. LAKELAND'S ORAL HEARING REQUEST

Lakeland's request for an oral hearing is best seen as a corollary to its discovery request. Lakeland argues, essentially, that an oral hearing is required to ferret out facts; it contends that "[a]fter precluding a protestant from obtaining evidence through discovery, the ICC cannot rely upon the absence of material facts in dispute to deny a protestant's request for an oral hearing." Pet. Br. at 33. Lakeland cites two cases as standing for this proposition; in fact, neither does. *Boston Carrier, Inc. v. ICC*, 728 F.2d 1508, 1511 n. 5 (D.C.Cir.1984), merely notes, in the course of denying a request for an oral hearing, that the protestant had not availed itself of discovery procedures that *may* have obviated the need for an oral hearing. *C & H Transportation Co. v. ICC*, 704 F.2d 834, 848 n. 23 (5th Cir.1983), also affirmed an ICC denial of an oral hearing, and also noted that the protestant had failed to invoke possibly helpful discovery procedures.

The Fifth Circuit did add that the protestant might be able to show the discovery procedures to be "prejudicially deficient in a particular case." Our determination here, however, is not that the ICC's discovery procedures are prejudicially deficient; rather, we hold that the procedures appropriately match the relative lenity of the BRRA's certification scheme, but that in one instance the Commission relied on an erroneous factual predicate in denying discovery.

■ Finally, the implementing regulations provide that "[t]he Commission intends to assign matters for oral hearing only where the use of modified procedures would prejudice a party, material issues of decisional fact cannot adequately be resolved without an oral hearing, or assignment of an application for oral hearing is otherwise required by the public interest." 49 C.F.R. § 1160.68(c). There is no real argument that the Commission has somehow violated this rather open-ended regulation in this case. Accordingly, we affirm its refusal to hold an oral hearing.[8]

---

7. As usual in a *Chenery*-type remand, the agency is free to take the same action for a proper reason, or to take a different action altogether. *See, e.g., American Pub. Transit Ass'n v. Lewis*, 655 F.2d 1272 (D.C.Cir.1981). We should note that during oral argument the following colloquy occurred:
   Court: Suppose the petitioner had limited his discovery request to present and proposed operating schedules, fares, and cost of operation?
   ICC: That would be a fair request and one that was answered by applicant's attorneys, "we do not have that information. We have not determined what we're going to do." They haven't started operating yet . . .
   Court: They didn't even have a proposed operating schedule?
   ICC: No, apparently not.
   Court: I understand it's not in the record. But I'm saying if the discovery request had been limited to that, the agency wouldn't have required them [Pocono Mountain] to come up with something?
   ICC: Well not in the face of the fact that the applicant's attorney says "we don't have it."
   Based upon this exchange, it is possible that the ICC might again reject petitioner's request for schedule, route, and service point information, this time on the ground that no such information exists. If it did so, however, it would

raise more serious concerns than already exist in this case about the ability of a protestant ever to make out a case against an applicant. Rather than face such an extreme position prematurely, we prefer to remand on the narrow point of the ICC's factual error about present Pocono Mountain operations in order to allow it to decide whether in fact it would deny Lakeland the right to any preview of the scope of the applicant's intended operations. It is unclear from ICC counsel's reference at what point Pocono Mountain's attorneys made the statement as to the nonexistence of any information about proposed operations and whether it continues to be true. We note, as well, that although 49 C.F.R. § 1104.4(a) (1986) permits an attorney's signed representation of a fact based on personal knowledge—in lieu of an affidavit or other form of verification—this regulation does not appear to encompass the kind of *oral* representation that Pocono Mountain's lawyer apparently made to the ICC here. Given the meager amount of information required of an applicant under the BRRA, we suggest the importance of the Commission's adherence to its own regulations about informal supplementations thereof.

8. We also reject petitioner's other methods of arguing that it was precluded from presenting its case. That is, we find that the ICC's procedures violated neither the Administrative Proce-

Lakeland's petition for review of the ICC's order denying it discovery and an oral hearing is, therefore,

*Granted,* with regard to schedules, routes, and service points information, and *Denied* in all other respects.

dure Act nor the fifth amendment's due process clause, and we find that the ICC made adequate

findings of fact and conclusions of law.